1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**\*E-Filed 04/28/2010\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

AQUA-LUNG AMERICA, INC., a
Delaware Corporation,

                Plaintiff,

    v.

AMERICAN UNDERWATER
PRODUCTS, INC., d/b/a OCEANIC, a
California Corporation; and TWO FORTY
DEUCE CORPORATION, a Colorado
Corporation,

                Defendants.

_____/

No. C 07-02346 RS

**ORDER GRANTING IN PART AND
DENYING IN PART SUMMARY
JUDGMENT**

## I.  INTRODUCTION

      This case arises out of a series of scuba equipment patents.  At the heart of the dispute are

three patents held by defendant Two Forty Deuce ("TFD") and exclusively licensed to defendant

American Underwater Products, d/b/a Oceanic ("AUP"):  U.S. Patent No. 6,601,609, issued August

5, 2003 (the "'609 Patent"); U.S. Patent No. 6,901,958, issued June 7, 2005 (the "'958 Patent"); and

U.S. Patent No. 7,185,674, issued March 6, 2007 (the "'674 Patent").  Plaintiff Aqua-Lung America,

Inc. ("Aqua-Lung") filed a complaint for declaratory judgment of patent invalidity and non-

United States District Court

For the Northern District of California

infringement against AUP and TFD (collectively, "Oceanic").  Oceanic counterclaimed for

infringement.  The parties have each moved for summary judgment on these claims.  For the reasons

stated below, Oceanic's motion for summary judgment on infringement will be granted with respect

to the '674 Patent, and Aqua-Lung's motion for summary judgment on non-infringement will

likewise be denied as to this patent.  As to the other two patents, the accused devices do not infringe,

and consequently Oceanic's motion for summary judgment on infringement will be denied and

Aqua-Lung's motion for summary judgment on non-infringement will be granted.  Aqua-Lung's

motion for summary judgment of invalidity will also be denied.

Oceanic also counter-claimed against Aqua-Lung for fraud and trade secret

misappropriation, and Aqua-Lung has moved for summary judgment on these claims.  Genuine

issues of material fact exist for the latter, but not the former.  Accordingly, summary judgment is

granted in favor of Aqua-Lung on the fraud counter-claim, but summary judgment is denied as to

the trade secret misappropriation counter-claim.

## II.  BACKGROUND

A typical scuba system works as follows.  A tank of compressed gas, usually worn on the

diver's back, is connected to the diver's mouth via a hose.  At each end of this hose, there is a device

called a regulator.  The regulator at the "tank end" of the hose is called the first stage regulator, and

that at the "mouth end" is called the second stage regulator.  The two regulators work together to

reduce the pressure of the compressed gas from the scuba tank as it travels the length of the hose,

such that by the time the gas enters the diver's mouth, it is breathable.  This lawsuit concerns the

design of a valve that is intended to link the first stage (tank-end) regulator to the scuba tank.

Oceanic contends that Aqua-Lung's Kronos, Legend, and Titan families of regulators each include

valves employing an "automatic closure device" that infringes on Oceanic's patents.

The basic purpose of the disputed valve is to prevent water and debris from entering the

first-stage regulator when the hose/regulator assembly is detached from the scuba tank.  The valve

may be activated, among other methods, by gas pressure in the hose or by mechanical means.  A

mechanically-activated valve is designed to open automatically every time the scuba tank is

No. C 07-02346 RS
ORDER

United States District Court
For the Northern District of California

connected to the hose/regulator assembly and close whenever the scuba tank is detached.  A gas-pressure activated valve, by contrast, is designed to close when the air pressure on the downstream side of the valve equalizes with the air pressure on the upstream side of the valve.  In practice, this means the valve opens and closes every time the diver inhales and draws air from the pressurized scuba tank.  Aqua-Lung's valve is mechanically activated.

Aqua-Lung filed a complaint in April 2007 and an amended complaint in July 2007.  The amended complaint sought a declaratory judgment that Aqua-Lung's valve does not infringe the three patents-in-suit.  It also sought a declaratory judgment of invalidity as to all three Oceanic patents.  Oceanic counter-claimed for infringement, for misappropriation of trade secrets in violation of Cal. Civil Code § 3426, and for fraud/misrepresentation.  The Court issued its claim construction order in February 2009.  Aqua-Lung seeks summary judgment rejecting Oceanic's fraud and trade secret misappropriation claims and invalidating the patents-in-suit. The parties have also brought cross-motions seeking to have infringement resolved one way or another, as a matter of law.  The parties presented argument on these motions on March 24, 2010.

## III.  LEGAL STANDARDS

A.    Summary Judgment Generally

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The moving party bears the initial burden of informing the Court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.  *Id.* at 323.

If the moving party meets its initial burden, it then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. The evidence and all reasonable inferences therefrom must be viewed in

the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986). Summary judgment is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. *Anderson*, 477 U.S. at 248; *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991). Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

B.    Summary Judgment Standards Regarding Patent Infringement and Invalidity

With regard to the parties' cross-motions on infringement, summary judgment is appropriate: 1) where "only one conclusion as to infringement could be reached by a reasonable jury;" or 2) "when the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002). Patent infringement analysis involves two steps: 1) claim construction; and 2) application of the properly construed claims to the accused device or method. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). The first step is a question of law. *Id.* at 979. In the instant litigation, the Court completed this step with the claim construction order. The parties, through their cross-motions, suggest the time has now arrived for the second step of the infringement analysis.

To prove infringement, a patent holder must show that the accused device or method meets each claim limitation, either literally or under the doctrine of equivalents. *See Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Here, Oceanic's infringement arguments center on the "literal" prong. A literal infringement analysis takes the claims that the Court has previously construed and compares them to the accused device. *See Markman*, 52 F.3d at 976. "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system." *TechSearch, L.L.C.*, 286 F.3d at 1371.

No. C 07-02346 RS
ORDER

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1   "Any deviation from the claim precludes such a finding." *Telemac Cellular Corp. v. Topp Telecom,*

2   *Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). The patent holder bears the burden of proving that each

3   accused product "includes every limitation of [an asserted] claim or an equivalent of each

4   limitation." *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

5          Infringement is a question of fact. *Frank's Casing Crew & Rental Tools, Inc. v.*

6   *Weatherford Int'l, Inc.*, 389 F.3d 1370, 1376 (Fed. Cir. 2004); *see also Bai v. L&L Wings, Inc.*, 160

7   F.3d 1350, 1353 (Fed. Cir. 1998) (holding that the second step of the infringement analysis is a

8   factual question). The court can resolve the issue on summary judgment only if "no reasonable jury

9   could find that every limitation recited in the properly construed claim either is or is not found in the

10  accused device." *Frank's Casing Crew*, 389 F.3d at 1376. That said, the absence from the accused

11  product of one limitation in the claim means that, as a matter of law, there is no literal infringement

12  of that claim. *Id.*

13         With respect to invalidity, summary judgment is as appropriate in a patent case as it is in any

14  other case. *C.R. Bard Inc. v. Advanced Cardiovascular Sys.*, 911 F.2d 670, 672 (Fed. Cir.1990). A

15  patent is presumed valid. 35 U.S.C. § 282. The burden is on the party challenging the patent to

16  show, by clear and convincing evidence, that the patent is invalid. *See, e.g.*, *Hybritech Inc. v.*

17  *Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986); *see also Invitrogen Corp. v. Clontech*

18  *Labs., Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005) (requiring the party asserting invalidity to prove

19  by clear and convincing evidence that the invention was not abandoned, suppressed, or concealed

20  under § 102(g)). Because this standard must be employed at the summary judgment stage just as it

21  would be used at trial, Aqua-Lung has the burden of showing that there is an undisputed record from

22  which a finder of fact would find by clear and convincing evidence that the three patents-in-suit are

23  invalid. *Eli Lilly & Co. v. Barr Lab., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

24                                    IV.  ANALYSIS

25  A.      Infringement

26         Aqua-Lung moves for summary judgment on its claim of non-infringement of the patents-in-

27  suit, and Oceanic moves for summary judgment on its corresponding infringement counter-claim.

28

1    These motions pose similar issues and are effectively cross-motions for summary judgment.  As a

2    result, they will be addressed together.

3        1.    The '674 Patent[1]

4            a.    Location of Pressure Responsive Element and Spring

5        Claim 1 of the '674 Patent discusses a device called the pressure responsive element[2]

6    ("PRE"), along with an accompanying spring that is "configured to bias" the PRE.  '674 Patent,

7    col.26 l.46, 49.  The first set of arguments in the cross-motions concerns the position of this

8    PRE/spring assembly within the disputed valve design.  The second and third limitations of Claim 1

9    of the '674 Patent describe a PRE "located *within the bore*" and "a spring located *within the bore*."

10   *Id.* (emphasis added).  Aqua-Lung contends that Claim 1 of the '674 patent protects only devices

11   whose PREs and accompanying springs are positioned within the filter assembly's "bore," and that

12   the accused products' PREs and springs are outside such a bore.  Oceanic disagrees, contending that

13   the casing in which the PREs and springs are housed qualifies as a "bore," and therefore the accused

14   devices cannot be differentiated on this basis.

15       During claim construction, the Court defined a "bore" as "a cylindrical hole or passage."

16   Aqua-Lung contends the PRE and spring in the accused devices occupy a space that is not

17   cylindrical, but annular—i.e., ring-shaped (like a doughnut).  Oceanic protests that the term

18   "cylindrical" refers to *any* round hole or passage, regardless of whether the passage has a hollowed-

19   out center like an annulus; and thus, the fact that Aqua-Lung's PRE and spring are located in an

20   annular space does not preclude a finding on summary judgment that this claim was infringed.

---

[1] After initially suggesting that it is seeking summary judgment on the Kronos, Legend, and Titan lines of regulators, Oceanic noted that the Kronos line uses "a disc-shaped filter rather than a cone-shaped one" like the Titan and Legend lines.  Defendants' Motion for Summary Judgment of Patent Infringement at 3.  Thus, it conceded the Kronos line does not infringe on the '674 Patent.  *Id.* at 4-14.  Therefore, summary judgment will be granted in favor of Aqua-Lung with respect to the issue of whether the Kronos line infringes on the '674 Patent.

[2] During claim construction, the Court defined a PRE as "an element of a device which can move from a first position where it prevents fluid flow into the device, to a second position, where it allows fluid flow into the device."  Order Construing Claims at 24.

No. C 07-02346 RS
ORDER

6

**United States District Court**
For the Northern District of California

These arguments turn on the question of whether the term "bore" should be read to encompass annular spaces.  The claim construction order's discussion of the term is instructive in this regard.  It states that "a review of the embodiments [of the patents-in-suit] accompanying the specification reveals that a 'bore' is portrayed as a *circular* opening or hole in the housing . . . Two-Forty's proposed definition [of a 'bore' as 'a hole or passage'], however, lacks the 'cylindrical' qualifying element that Aqua-Lung proposed and is present in the embodiments.  At the hearing, both sides agreed that the term 'bore' does bring in this cylindrical concept."  Order Construing Claims at 8; *see also* Transcript of *Markman* Hearing at 121 (when the Court inquired whether there was any difference between a "hole" and "an internal passageway that is cylindrical," defense counsel conceded there was no difference "that [he] could think of currently").  Thus, the Court's primary concern at the claim construction stage was the *circularity* of the bore, not the *hollowness*.  For this reason, Oceanic's interpretation of the definition of "bore"—essentially any round hole or tube, whether hollow or solid—is faithful to the Court's original intent in the claim construction order.

For this reason, the PREs and springs in the accused devices, which are positioned in an annular space inside the valve in Aqua-Lung's designs, can fairly be said to be located "within a bore."  In the absence of any disputed issues of fact on this issue, with respect to the location of the PRE and spring in claim 1 of the '674 Patent, the accused devices do not meaningfully differ from the device claimed in the patent.

> b.  Retainer Device

The parties next disagree on whether the accused devices contain a "retainer device."  This term is present in the fifth limitation of Claim 1, which describes "a retainer device for removably securing the filter."

Aqua-Lung argues that the accused devices' O-ring does not fall within the concept of "retainer device," because it cannot hold the filter in place against a blast of pressurized gas (a fact which Aqua-Lung's expert claims to have demonstrated).  Therefore, Aqua-Lung contends, its O-ring does not "secure" the filter.  Oceanic counters that, even if the O-ring does not secure the filter

against a blast of air, it nonetheless fixes the filter strongly enough in place to prevent it from falling out whenever someone picks up the device. This, Oceanic claims, is all the patents mean by "secure."

This question—effectively, how secure is "secure"—was not addressed directly during the claim construction phase. At that time, the Court defined "retainer device" as "a mechanism configured removably to secure the filter and other parts within the passageway." Order Construing Claims at 13. The language of the claims, which the order quotes throughout and explicitly bases itself upon, reads "configured *to removably secure*." The original patent phrase "for removably securing the filter" was unquestionably the basis of the claim construction order; and this phrase unambiguously denotes an ability to take the filter on and off easily. Thus Oceanic's argument—effectively that "to secure" does not mean "to fix immovably against all imaginable forces"—is more persuasive here.

Aqua-Lung also attempts to distinguish its accused devices on the basis of the Court's phrase "the filter and other parts." According to Aqua-Lung, the O-ring secures the filter but *not* any other parts, so the O-ring does not fall within the definition of "retainer device." Oceanic contends the "and" is disjunctive (i.e. it means "and/or"); so if the mechanism secures the filter *and/or* any other parts, it falls within the definition of retainer device. Aqua-Lung's proposed interpretation is nonsensical—even Oceanic's own embodiments would be unlikely to satisfy the term "retainer device" if they were required to secure the filter *as well as* "other parts." Interpreting "and" disjunctively is more faithful to the meaning of the claim language, as well as the intent of the claim construction order. Again, absent a genuine disputed factual question, the accused devices cannot be distinguished on the basis that they lack a retainer device, as set forth in Claim 5.

c.   "Fluid Must Pass"

The seventh limitation of Claim 1 and the ninth limitation of Claim 13 in the '674 Patent are very similar. The former states: "wherein the filter is sized and shaped to block the exit opening *so that fluid must pass through the filter* to pass through the exit opening." '674 Patent, col. 26 l.59-61 (emphasis added). The latter states: "wherein the filter is located *so that fluid must pass through the*

United States District Court
For the Northern District of California

*filter* to pass through the gas outlet opening." *Id.*, col.28 l.1-2 (emphasis added).   Oceanic contends that Aqua-Lung's filter is designed to prevent any fluid (generally gas) from entering the regulator without passing through the filter, just as Claims 1 and 13 describe.  Aqua-Lung counters that even if its filter is blocked, air will still get through to the regulator, thus indicating that the accused products are not designed so that fluid *must* pass—only so that it *may* pass.

When the phrase "fluid must pass" is read in the context of the remaining language in the two limitations at issue, Oceanic's interpretation is compelling.  Both claims utilize the phrase "so that," which is a final coordinating conjunction.  Such conjunctions denote inferences or consequences.  The second clause gives a reason for the first clause's statement, or it shows what has been or ought to be done in view of the first clause's expression.  Here, "so that fluid must pass" *gives a reason* for why "the filter is sized and shaped to block the exit opening," in the words of Claim 1; and it *gives a reason* for where "the filter is located," in the words of Claim 13.  That is, in determining whether a particular device falls within the claim language, the relevant inquiry is the *intent* behind the filter's positioning.

Aqua-Lung does not deny that its design is *intended* to direct air through the filter on its way out the exit opening of the valve.  Aqua-Lung's own expert admitted that, in normal use, gas would travel through the top of the valve and "some of it would probably come through the filter," and that, based on his experience as a mechanical engineer, "I'd expect that you'd *want* to have the air go through the filter."  Cagan Deposition at 4-5, attached as Exh. 4 to Kauth Declaration (emphasis added).  Even a layman can understand that a filter located in an air passageway is almost certainly in place to filter air; and in any event, Aqua-Lung has offered no other reason for the filter's presence in the accused devices.  Rather, in effect, Aqua-Lung appears to be claiming that its design does not infringe because the filter does not work as well as it should.  As discussed above, however, the claims make clear that what matters is how the filter is *intended* to work.

In light of these considerations, the accused devices cannot reasonably be said to differ meaningfully from the designs described in the seventh limitation of Claim 1 and the ninth limitation of Claim 13.  Rather, they embody these limitations.

No. C 07-02346 RS
ORDER

United States District Court
For the Northern District of California

1  d.   "Removable through the exit opening"

2  The tenth limitation of Claim 1 of the '674 Patent states: "wherein the retainer device is

3  configured such that the filter is removable through the exit opening."  '674 Patent, col. 26 l.62-63.

4  The twelfth limitation of Claim 13 similarly states: "wherein the retainer device is configured such

5  that the filter is removable through the gas outlet opening."  *Id.*, col. 28 l.4-5.  Aqua-Lung does not

6  deny that the filter in the accused devices is removed through the exit opening; but nonetheless it

7  asks the Court to interpret the claims as requiring the retainer device to be configured "such that the

8  filter can be removed through the exit opening only after the retaining device has first been

9  removed."  It then argues that its own models differ because they allow the filter to be removed

10  *simultaneously* with the retainer device.  Aqua-Lung, however, has offered no persuasive argument

11  as to why the limitation it proposes should be read into the claim language.  It is undisputed that the

12  filter on Aqua-Lung's device comes out through the exit opening (and/or the gas outlet opening) and

13  nowhere else.  Aqua-Lung's attempt to distinguish the accused devices on this ground is therefore

14  unavailing.

15  e.   "Housing Defining an Internal Passageway"

16  The final limitation contested by the parties in the '674 Patent is the fourth limitation of

17  Claim 13, which states that the fluid flow control valve in the design is comprised of, among other

18  things, "a housing defining an internal passageway, where the passageway has a gas inlet opening

19  near an upstream end of said housing and a gas outlet opening near a downstream end of said

20  housing and spaced from the gas inlet opening."  '674 Patent, col.27 l.31-35.

21  The Court has defined "passageway" as "a conduit formed in the housing that allows gas to

22  pass through it."  Order Construing Claims at 6.  There can be little question that the fixed central

23  post, through which the air flows in the accused devices, matches this description.  Aqua-Lung

24  repeats its argument that the PRE and spring are not located in the passageway in the accused

25  devices; but this consideration is not relevant here, as the limitation in question makes no reference

26  to such apparatus.  As such, it appears the accused devices embody this limitation.

27  f.   Infringement of the '674 Patent

28

United States District Court
For the Northern District of California

As explained above, the accused devices embody Claim 1's limitations with respect to the position of the PRE and the spring; the existence of a retainer device; the passage of fluid through the filter; and the removability of the filter through the exit opening.  In addition to these, Claim 1 also has numerous other limitations.  Oceanic contends that the accused devices embody all of these remaining limitations, and Aqua-Lung has offered no argument to the contrary.  Oceanic further alleges that the accused devices infringe Claims 2, 3, 6, 7, 8, 9, and 12, all of which are dependent on Claim 1.  Oceanic has made a preliminary showing that each of these dependent claims is infringed, which Aqua-Lung has not contested.

Similarly, the accused devices embody Claim 13's limitations with respect to the existence of a retainer device; the passage of fluid through the filter; the removability of the filter through the exit opening; and the existence of a "housing defining an internal passageway" which has gas inlets and outlets at opposing ends.  Aqua-Lung does not appear to take issue with Oceanic's argument that the accused devices embody the remaining limitations in Claim 13.  Similarly, Oceanic alleges that the Titan and Legend devices infringe on Claims 14, 15, and 20-24, which depend on Claim 13.  As with the dependent claims pertaining to Claim 1, Aqua-Lung has not contested these.

Thus, the undisputed facts indicate that the accused Titan and Legend devices infringe on the '674 Patent.  For this reason, Oceanic's motion for summary judgment on infringement will be granted with respect to the '674 Patent, and Aqua-Lung's motion for summary judgment for a finding of non-infringement will be denied.[3]

2.    The '958 Patent

The '958 Patent discusses a device called a "retractable valve member" (Claim 1) or a "retractable member" (Claim 8).  The parties agree that this device does not differ materially from the PRE discussed in the '674 Patent, and for convenience this discussion will continue to call it a PRE.  *See* Aqua-Lung's Memo in Support of Non-Infringement at 9; Oceanic's Memo in Opposition to Non-Infringement at 3.  The second limitation of Claim 1 and the second limitation of Claim 8

---

[3] As noted above, this holding applies only to the Titan and Legend lines.  As to the Kronos line, the holding is reversed:  summary judgment is granted in favor of Aqua-Lung and denied with respect to Oceanic.

No. C 07-02346 RS
ORDER

11

describe the PRE, respectively, "within said passageway" and "within said duct." '958 Patent, col.18 l.7-8, 56.  The Court construed "passageway" and "duct" identically, describing both terms as "a conduit formed in the housing that allows gas to pass through it."  Order Construing Claims at 9.

The parties' arguments regarding these concepts resemble their arguments regarding the "bore" in the '674 Patent, in that they disagree as to whether the PRE in the accused products can be said to be located within a "passageway" or "duct."  Aqua-Lung contends that its own design allows gas to flow through a conduit that is located on the interior of a fixed central post, and that there is no PRE located inside this conduit.  Rather, Aqua-Lung avers, the PRE is located outside and surrounding the fixed central post where the gas flows.  Oceanic counters that, in Aqua-Lung's design, the PRE and the fixed central post where the gas flows are both located inside the same housing, and that the presence of the "non-integral center portion" does not detract from the fact that the PRE is within a duct or passageway where gas flows.  In effect, Aqua-Lung's position is that the "conduit" in question is the fixed central post, around which the PRE is wrapped; whereas Oceanic takes the position that the "conduit" in question is the larger housing that contains both the fixed central post and the PRE.

To determine who is correct, it is important to consider the plain meaning of "conduit." According to the Court's definition, the relevant "conduit" is one which is formed in the housing for the express purpose of guiding or directing the gas through the filter.  Thus Aqua-Lung's position— that the fixed central post is really the conduit in question—is more persuasive, because that post's sole function is to direct gas flow.  In contrast, the larger housing—to which Oceanic refers— encapsulates the PRE and the spring, as well as the smaller channel through which gas is directed; so it performs more functions than just directing gas.  For this reason, it is more consistent with the Court's claim construction order to interpret the claims in the '958 Patent as protecting only PREs which are located within a conduit *whose sole purpose* is to direct gas flow through the filter.  The PRE in Aqua-Lung's design, by contrast, should not be considered to be positioned within a conduit, because the structure in which it is located houses not only the PRE, but also a spring and a smaller conduit that exists for the sole purpose of directing gas.  For this reason, Aqua-Lung's PRE

No. C 07-02346 RS
ORDER

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1 | cannot be said to be within a "duct" or "passageway." As the accused products do not embody this

2 | limitation regarding PRE position, they cannot be said to infringe on Claims 1 and 8. Once again,

3 | determination of the issue does not turn on any disputed issues of fact.

4 | Claims 1 and 8 are independent claims. Oceanic also asserts that Aqua-Lung has infringed

5 | Claim 7, which is dependent on Claim 1, and Claim 14, which is dependent on Claim 8. *See* '958

6 | Patent, col. 18 l.43-45 & col.20 l.4-6. The Federal Circuit, however, has explained that "'[o]ne may

7 | infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not

8 | true. One who does not infringe an independent claim cannot infringe a claim dependent on (and

9 | thus containing all the limitations of) that claim.'" *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d

10 | 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546,

11 | 1552 (Fed. Cir. 1989)). Accordingly, since Aqua-Lung has not infringed independent Claims 1 and

12 | 8, it cannot be said to have infringed dependent Claims 7 and 14. As a result, Aqua-Lung's motion

13 | for summary judgment for non-infringement will be granted in full with respect to the '958 Patent.

14 | Correspondingly, Oceanic's motion for summary judgment of infringement of this patent will be

15 | denied.

16 |     3.   <u>The '609 Patent</u>

17 | The '609 Patent refers to the PRE as a "retractable filter cover" (Claim 5), a "retractable

18 | member" (Claims 18 and 27), or "a gas flow control element" (Claim 37); but, as with the '958

19 | Patent, the parties agree these are merely alternate names for the same device. Within the '609

20 | Patent, the second limitation of Claim 5 and the second limitation of Claim 27 describe a PRE

21 | "within said passageway," '609 Patent, col. 20 l.16 & col.22 l.31-32, and the second limitation of

22 | Claim 18 and second limitation of claim 37 describe a PRE "within said duct," *id.* col.21 l.21. As

23 | with the '958 Patent, no issues of fact relevant to the question remain to be determined. The

24 | accused devices' PREs simply cannot be said to exist within a passageway or duct as those terms are

25 | used in the '609 Patent. Likewise, under *Monsanto*, Aqua-Lung cannot be said to have infringed

26 | Claims 29 and 30, both of which depend on Claim 27. Aqua-Lung's motion for summary judgment

27 |

28 |

United States District Court
For the Northern District of California

1    on its non-infringement claim will therefore be granted in full with respect to the '609 Patent.

2    Similarly, Oceanic's motion for summary judgment of infringement of this patent will be denied.

3    B.    Invalidity

4         Aqua-Lung's motion for summary judgment on the basis of invalidity is premised on its

5    position that all claims of the three patents-in-suit fail to meet 35 U.S.C. § 112's written description

6    requirement.  The first paragraph of section 112 states:  "The specification shall contain a written

7    description of the invention, and of the manner and process of making and using it, in such full,

8    clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with

9    which it is most nearly connected, to make and use the same, and shall set forth the best mode

10   contemplated by the inventor of carrying out his invention."

11        Each claim of a patent is presumed to be valid.  35 U.S.C. § 282; *Abbott Lab. v. Syntron*

12   *Bioresearch, Inc.*, 224 F.3d 1343, 1357 (Fed. Cir. 2003).  Patents may be held invalid for failure to

13   meet the written description requirement of 35 U.S.C. § 112 when narrow specifications fail to

14   support a broad claim.  *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir.

15   1998).  Invalidity under § 112, however, is a question of fact.  *Cordis Corp. v. Medtronic Ave., Inc.*,

16   339 F.3d 1352, 1364.  As previously noted, to obtain a finding of invalidity under § 112 prior to

17   trial, a party "must submit such clear and convincing evidence of invalidity such that no reasonable

18   jury could find otherwise*." Eli Lilly & Co. v. Barr Lab., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

19        Here, Aqua-Lung contends that Oceanic's claims fail to meet the written description

20   requirement because the alleged parent application of the patents-in-suit describes designs for fluid-

21   activated valves only (of which Oceanic's gas-activated valves are one example).[4]  Therefore, Aqua-

22   Lung contends that, under the written description doctrine, the claim language cannot validly reach

---

[4] The claimed parent application for all three of the patents-in-suit was filed on June 1, 2001.  U.S. Patent Application No. 09/872,130 (the "'130 Application").  These drawings, as well as the portion of the specification pertaining to mechanically-operated valves, were added via a now-abandoned continuation-in-part ("CIP"), filed February 28, 2002, from which the '674 Patent's application is derived.  It is not presently clear whether Oceanic may claim priority for the amended material back to the '130 Application's original priority date in June 2001, or if the proper priority date is the February 2002 date when the amendments were filed.  These differing priority dates, however, are not material to the present discussion.  Regardless of which priority date Oceanic is entitled to, the sufficiency of the written description turns on what exists in the patent's specification as issued, and not on what may have existed in an original application.

valves operating in *other* ways.  For example, valves could be mechanically-operated, like Aqua-Lung's.  Aqua-Lung further suggests they could be manually operated, temperature responsive, electrical, or operated by magnets.  At any rate, the basic argument is that the claims of the patents-in-suit cannot be validly read to extend to non-fluid-operated valves like those embodied in the accused products.

Oceanic complains that this argument is an improper attempt import limitations from the specifications into the claims.  It is axiomatic that "a court may not read a limitation into a claim from the specification."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004); *White v. Dunbar*, 119 U.S. 47, 52 (1886) ("The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is.").  In the landmark *Gentry Gallery* case, the Federal Circuit noted that "a claim may be broader than the specific embodiment disclosed in a specification," and that "[a]n applicant is entitled to claims as broad as the prior art and his disclosure will allow."  134 F.3d at 1480.  Nonetheless, no "applicant can broaden his claims to the extent that they are effectively bounded only by the prior art."  *Id.*  Rather, "claims may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will limit claim breadth."  *Id.*  "*Gentry Gallery*, then, considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element of [the inventor's] invention.'"  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999).  *Gentry Gallery* does not, however, mandate an inquiry into what an inventor considers to be essential to his invention, nor does it require that the claims incorporate those limitations.  *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002).

In this case, Aqua-Lung's argument is unpersuasive with respect to the '609 and '958 Patents.  The abstracts of these two patents, which summarize their respective specifications, disclose a PRE "disposed within the passageway for selectively opening and closing the inlet opening to fluid flow in response to *fluid pressure* exerted thereon at the inlet opening" (emphasis

United States District Court
For the Northern District of California

1   added).    Similarly, the claims of these two patents discuss a PRE that is located within the

2   passageway *through which fluid is flowing*.  *E.g.*, '609 Patent, col. 20 l.16 & col.22 l.31-32; '958

3   Patent, col.18 l.7-8, 56.  This apparently close match between the specifications and the claims

4   reflects the flaw in Aqua-Lung's contention that, as a matter of law, the written description

5   requirement is not satisfied here.   Indeed, as explained above, Aqua-Lung's accused products do

6   not infringe on these patents precisely because their PREs, which are not gas-pressure activated, are

7   located outside the passageway through which the gas flows.  Aqua-Lung is therefore not entitled to

8   summary judgment on its invalidity claim with respect to the '609 and '958 Patents.

9          The analysis is somewhat different with respect to the '674 Patent.  The claim language (as

10   construed above) and the specification language are both broader here.   The patent's abstract omits

11   the key term "fluid" which is employed in the earlier patents' abstracts:  it discloses a PRE

12   "disposed within the passageway for selectively opening and closing the inlet opening to fluid flow

13   in response to *pressure* exerted thereon at the inlet opening" (emphasis added).  Likewise, the

14   specification itself, after explaining the operation of a fluid-activated mechanism, states: "An

15   alternative fail-safe mechanism for operating the inlet valve of the present invention involves

16   *mechanical pressure* in the form of physical contact against the pressure responsive element in lieu

17   of fluid pressure."  '674 Patent, col. 19, l.5-7; *see also id.*, figs. 43-60 (illustrating the operation of

18   mechanically operated valves).

19          Similarly, the claim language describes a PRE and spring assembly operating within a bore

20   but does not in any way limit that PRE's activation to fluid flow.  As explained in detail above, a

21   bore may house elements in addition to a conduit for fluid flow.  Thus the PRE's location within the

22   bore, standing alone, does not indicate one way or another how it is activated.  Rather, the claim

23   language, like the specification language, leaves plenty of room for both mechanically activated and

24   fluid pressure activated PREs.  For this reason, there is enough of a match between the

25   specifications and the claims to indicate that Aqua-Lung cannot meet its summary judgment burden

26   of showing, as a matter of law, the inadequacy of the written description.  Consequently, Aqua-

27

28

1    Lung's motion for summary judgment on invalidity must be denied with respect to the '674 Patent

2    as well.

3            C.    Fraud

4            Next, Aqua-Lung seeks summary judgment on Oceanic's counterclaim for fraud.  "A cause

5    of action for fraud [under California law] requires the plaintiff to prove (a) a knowingly false

6    misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the

7    plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages." *Glenn K. Jackson Inc. v.*

8    *Roe*, 273 F.3d 1192 (9th Cir. 2001) (quoting *Wilkins v. Nat'l Broadcasting Co., Inc.,* 71 Cal.App.4th

9    1066, 1082 (1999)); *see also* Cal. Civil Code § 1572.

10           Here, the essence of Oceanic's fraud counterclaim is its contention that Aqua-Lung kept

11   egging on TFD during negotiations over licensing TFD's valve technology, thereby inducing TFD

12   to disclose more and more information.  All along, according to Oceanic, Aqua-Lung had no

13   intention of entering into a license agreement.  The counterclaim, however, lacks specificity on this

14   point.  It merely states:  "Aqua-Lung conveyed [the] fact that it was interested in licensing the

15   technology, which Aqua-Lung knew to be false."  Answer and Counterclaim, ¶ 51.  Oceanic has not

16   pointed to a particular statement by Aqua-Lung that it contends was false.  Rather it offers only the

17   general averment that Aqua-Lung employees led on TFD.  To establish fraud, however, at least a

18   preliminary showing that an Aqua-Lung employee made a particular statement, knowing it to be

19   false even when made, would be required.  *See* Cal. Civil Code § 1572(1) (defining actual fraud as

20   "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true").

21           Based on these principles, even drawing all reasonable inferences in favor of Oceanic, no

22   genuine issues of material fact exist which would allow Oceanic's fraud counterclaim to proceed.

23   Aqua-Lung's motion for summary judgment on this counterclaim therefore must be granted.

24           D.    Trade Secret Misappropriation

25           Aqua-Lung also seeks summary judgment on TFD's counterclaim for trade secret

26   misappropriation.  This claim is based on Cal. Civil Code § 3426.1, which prohibits "disclosure or

27   use of a trade secret of another without express or implied consent by a person who . . . (B) at the

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret

2  was: . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its

3  use." The statute defines a trade secret as information that "(1) Derives independent economic

4  value, actual or potential, from not being generally known to the public or to other persons who can

5  obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable

6  under the circumstances to maintain its secrecy." Cal. Civil Code § 3426.1(d).  "When information

7  has no independent economic value, a claim for misappropriation lacks merit." *Gemini Aluminum*

8  *Corp. v. Calif. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1262 (Cal. App. 2002) (citation

9  omitted).

10      Oceanic served Aqua-Lung with an initial identification of trade secrets, in accordance with

11  California statutory law.  *See* Cal. Civ. Proc. Code § 2019.210 ("In any action alleging the

12  misappropriation of a trade secret under the Uniform Trade Secrets Act . . . , before commencing

13  discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade

14  secret with reasonable particularity[.]").  This disclosure asserted that TFD had disclosed "a fluid

15  flow control valve" embodied in "a number of prototypes [which] contained structure for preventing

16  moisture intrusion and contamination of regulators."  TFD's Identification of Trade Secrets,

17  attached as Exh. 1 to Aqua-Lung's Motion for Summary Judgment as to Trade Secret

18  Misappropriation, at 2-3.  Language elaborating on the nature of the "fluid flow control valve"

19  appeared to be drawn almost verbatim from the patent claims.  *Id.* at 1 (describing the valve as

20  "having a housing defining an inlet and an outlet, and including a pressure responsive element for

21  selectively opening and closing the inlet opening to fluid flow in response to a force exerted on the

22  pressure responsive element, with a mechanism for exerting a bias force against the pressure

23  responsive element sufficient to close the inlet opening to fluid flow absent a pre-established force

24  exerted on the pressure responsive element in opposition to the bias force").

25      This information was supplemented by Aqua-Lung's deposition of Shane Taylor, the

26  inventor of the technology at issue in this suit.  He stated that the trade secret he believes Aqua-

27  Lung misappropriated was "dry valve technology."  Taylor Depo., attached as Exh. 5 to Aqua-

28

1    Lung's Motion for Summary Judgment as to Trade Secret Misappropriation, at 260, l.1-2.  When

2    asked to clarify, he defined "dry valve technology" as "the technology . . . for regulators, preventing

3    the water from getting in the regulator, first stage" and "*the technology of the fluid flow control*

4    *valve in my first [patent] application and from that point forward*."  *Id.* l.12-15; 261, l.14-16

5    (emphasis added).   The following exchange then ensued:

6         Q:       That is what you mean by dry valve technology?

7         A:       That is what I mean by dry valve technology, everything I just listed.  And it is
                   definitely not limited to what I just listed. . . .  I have defined it verbally the best way
8                  I can.  At this time, that is my answer for you.

9         Q:       You can't be any more precise?

10        A:       No.  I can't be any more precise at this time.

11
12   *Id.* at l.17-22; 262 l.5-10.

13        In short, the initial identification of trade secrets and the inventor's deposition do not reveal

14   that the allegedly misappropriated technology was anything other than what was described in the

15   patents-in-suit.  It is a long-held tenet of patent law that issuance of a patent extinguishes any action

16   for protection of the technology covered by such patent as a trade secret.  *E.g.*, *Newport Indus. v.*

17   *Crosby Naval Stores*, 139 F.2d 611 (5th Cir. 1944) ("A trade secret . . . cannot possibly be patented.

18   This claim is a separate one, just as a suit for appropriation of literary property is separate from a

19   suit under the copyright laws.").  A patent is a public record, the issuance of which results in a

20   public disclosure of the claims and specifications of the patent in return for a limited patent

21   monopoly.  Therefore, a plaintiff has a viable trade secret claim that would protect his proprietary

22   unpatented technology, only if he reveals "implementation details and techniques" *beyond* what was

23   disclosed in his patent.  *See Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1358

24   (Fed. Cir. 1998).

25        Here, Taylor's initial patent application was filed on June 1, 2001 and published on

26   December 5, 2002.  It is undisputed that no disclosures took place before June 15, 2002.  TFD

27   Responses to Request for Admission, attached as Exh. 11 to Aqua-Lung's Motion for Summary

28

No. C 07-02346 RS
ORDER

19

**United States District Court**
For the Northern District of California

1    Judgment as to Trade Secret Misappropriation, ¶ 17.  Thus, the period of time from June 15, 2002,

2    to December 5, 2002 was the only time during which Aqua-Lung could conceivably have

3    misappropriated a trade secret—that is, information that was not already public knowledge.

4         It is also undisputed that Aqua-Lung did not commence selling regulators containing an

5    automatic closure device until early 2006, more than three years after the publication of the patent

6    application and three and a half years after Aqua-Lung's June 15, 2002, meeting with Taylor.  The

7    regulators sold at this time by Aqua-Lung were the subject of a separate patent, U.S. Patent No.

8    7,334,772 (the "'772 Patent"), which was issued to a subsidiary of Aqua-Lung itself.  Crucially, the

9    '772 Patent cites all three of the patents-in-suit as prior art; and the USPTO will not issue a patent if

10   the proposed invention is "anticipated by any prior invention or device" or "obvious through

11   application of any prior art."  35 U.S.C. §§ 102, 103.

12        This would suggest that, even if Aqua-Lung gleaned trade secrets from its meetings with

13   Taylor during the narrow window of time between June and December 2002, Aqua-Lung in fact did

14   not disclose or use such information.  The plain language of § 3426.1 prohibits only the disclosure

15   or use of a trade secret, not its mere possession.  *See AccuImage Diagnostics Corp v. Terarecon,*

16   *Inc.*, 260 F. Supp. 2d 941, 951 n.5 (N.D. Cal. 2003).  Oceanic, however, offers expert testimony

17   suggesting that Aqua-Lung introduced products incorporating the technology described in the '772

18   Patent approximately six months earlier than it otherwise could have, had it not been for early

19   access to Taylor's technology.  Aqua-Lung counters that three years elapsed between its meetings

20   with Taylor and the issuance of the '772 Patent, and this proves that Aqua-Lung did not gain any

21   unfair advantage through alleged use of Taylor's designs.

22        These two competing positions suggest the existence of unresolved issues of fact

23   surrounding the trade secret misappropriation dispute.  Disclosure and/or use of the trade secret in

24   question is a crucial element of a misappropriation claim, and Oceanic has made a sufficient

25   showing that genuine issues of material fact exist on this element.  Furthermore, it has also made a

26   preliminary showing of fact as to the other elements of trade secret misappropriation.  As genuine

27

28

1   issues of material fact exist on this claim, Aqua-Lung's motion for summary judgment must be

2   denied.

3                                        V.  CONCLUSION

4          For the reasons stated above, (1) Aqua-Lung's motion for summary judgment on its non-

5   infringement claim is granted as to the '958 Patent and the '609 Patent, and Oceanic's cross-motion

6   for summary judgment on its infringement claim is likewise denied as to these two patents; (2)

7   Oceanic's motion for summary judgment on its infringement claim relating to the '674 Patent is

8   granted and Aqua-Lung's corresponding motion for summary judgment on its non-infringement

9   claim is denied; (3) Aqua-Lung's motion for summary judgment on Oceanic's fraud counter-claim

10  is granted; (4) Aqua-Lung's motion for summary judgment on its invalidity claim is denied; and (5)

11  Aqua-Lung's motion for summary judgment on Oceanic's trade secret misappropriation counter-

12  claim is denied.

13         The parties shall appear for a supplemental case management conference on **June 10, 2010,**

14  **at 10:00 a.m.** in Courtroom 3, 17th Floor, United States Courthouse, 450 Golden Gate Avenue, San

15  Francisco, California.  A supplemental joint case management statement should be filed no later

16  than **June 3, 2010**.

17

18         IT IS SO ORDERED.

19

20  Dated: 04/28/2010

21                                                   _____
                                                     RICHARD SEEBORG
22                                                   UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

United States District Court
For the Northern District of California